Opinion issued July 9, 2013



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00354-CV

_____

**CMA-CGM (AMERICA), INC., Appellant**

**V.**

**EMPIRE TRUCK LINES, INC., Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2005-22806**

---

## O P I N I O N

Appellant CMA-CGM (America) Inc. appeals the trial court's final summary judgment order. We affirm.

# BACKGROUND

In October of 2003, while Hector Aguirre (a Texas resident) was working as an independent truck driver for appellee Empire Truck Lines, Inc. (a Texas corporation), he was directed by Empire to transport cargo from Longview, Texas to the Port of Houston. At the Port, he dropped off a chassis and storage container and was instructed to pick up a new chassis and container for transport to another location in Houston, Texas. While the new chassis, which was owned by CMA, was being attached to his truck, it broke and injured Aguirre. Agurirre sued Empire, CMA, and others in Harris County, Texas.

## A. The UIAA Agreement

CMA and Empire's relationship was governed by a Uniform Intermodal Interchange and Facilities Access Agreement (UIIA). The UIIA is a standard contract drafted by and administered by an industry trade association, the Intermodal Association of North America (IANA), located in Maryland.

The UIIA is entered into by Equipment Providers (here, CMA), Motor Carriers (here, Empire), and Facility Operators (the party whose property is accessed for interchanging equipment). The stated purpose of the UIIA is "to establish [the parties'] respective understandings as to their rights and liabilities in one Party's access to the Premises of the other for purpose of interchanging

intermodal transportation Equipment and further establish the terms and conditions under which such intermodal Equipment will be used."

After Aguirre sued CMA for his injuries, CMA filed a cross-claim against Empire asserting the UIIA required Empire to insure, defend, and indemnify CMA for CMA's own legal fault. The UIIA contains the following definitions:

4. Equipment: Equipment . . . includ[es] . . . chassis . . . .

5. Equipment Owner: The holder of beneficial title to the Equipment, regardless of the form of the title.

. . . .

8. Indemnitees: Provider, Equipment Owner and/or Facility Owner, as their interest may appear.

. . . .

11. Motor Carrier: The Party being granted access to the Provider's facilities and/or having physical possession of the Equipment for the purpose of road transport or its designated agent or contractor.

. . . .

14. Provider: the Party authorizing delivery and/or receipt of physical possession of Equipment with a Motor Carrier.

Applying these definitions, Empire is the "Motor Carrier" and CMA is the "Equipment Provider," as well as an "Indemnitee." Section F.4, "Liability, Indemnity, and Insurance," of the Agreement states,

4. Indemnity: [EMPIRE] AGREES TO DEFEND, HOLD HARMLESS AND FULLY INDEMNIFY [CMA], AGAINST ANY AND ALL CLAIMS, SUITS, LOSS, DAMAGE OR LIABILITY, FOR BODILY INJURY, DEATH, AND/OR PROPERTY DAMAGE

3

. . . ARISING OUT OF OR RELATED TO [EMPIRE'S] USE OR MAINTENANCE OF THE EQUIPMENT DURING AN INTERCHANGE PERIOD; THE PERFORMANCE OF THIS AGREEMENT; AND/OR PRESENCE ON THE FACILITY OPERATOR'S PREMISES.

. . . .

6. Insurance: to the extent permitted by law, [Empire] shall provide the following insurance coverages in fulfillment of its legal liability and obligations contained in this Agreement:

a. A commercial automobile liability policy with a combined single limit of $1,000,000 or greater, insuring all Equipment involved in Interchange including vehicles of its agent or contractors; said insurance policy shall name [CMA] as additional insured.

b. A commercial general liability policy with a combined single limit of $1,000,000 or greater[.]

c. [Empire] shall have in effect, and attached to its commercial automobile policy, a Truckers Uniform Intermodal Interchange Endorsement (UIIE–1), which includes the coverages specified in Section F.4 . . . .

The UIIA states that, "[i]f it is determined that, at the time of the interchange, [Empire] was not insured in accordance with Section F.6. of this Agreement, [Empire] shall have been in material breach of this Agreement. . . ." The Agreement also provides, "This Agreement, including its Addendum, but only to the extent that its terms do not conflict with this Agreement, contain[s] the entire Agreement of the Parties hereto." Finally, the Agreement states, "Governing Law: The laws of the state of Maryland, the location at the principal place of business of the Intermodal Association of North America shall govern the validity,

4

construction, enforcement and interpretation of this Agreement without regard to conflicts of law principles."

**B. The Prior Proceedings**

Before they could be produced to Aguirre, CMA misplaced the chassis and related documentation, leading the trial court to grant Aguirre's motion for sanctions based on spoliation of evidence. Specifically, the trial court ruled that Aguirre was entitled to a jury instruction that CMA intentionally or negligently destroyed evidence, and that the jury should presume that the missing evidence would have been harmful to CMA's case. Before trial, however, Aguirre settled with both CMA and Empire, leaving only CMA's crossclaim for indemnity against Empire.

The trial court, applying Maryland law, granted summary judgment in Empire's favor on CMA's cross-claim, holding that the indemnity provision was not enforceable.

**1. The first appeal**

CMA appealed the trial court's summary judgment to this Court, where we held (1) Maryland law applied to the agreement, and (2) the agreement was enforceable as an insurance contract. *CMA-CGM (America) Inc. v. Empire Truck Lines Inc.*, 285 S.W.3d 9, 13–17 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (*CMA I*). On rehearing, Empire argued—for the first time—that section 623.0155

5

of the Texas Transportation Code renders the indemnification provision of the UIAA Agreement unenforceable as against Texas public policy.[1] We declined to address that issue in the first instance, but noted that the implications of section 623.0155 could be considered by the trial court on remand. *Id*. at 18–19 (supp. op. on rehearing).

## 2. The second appeal

On remand, the trial court granted summary judgment in Empire's favor again, this time on the ground that "the parties' indemnity agreement, although enforceable under Maryland law, is unenforceable here because it violates Section 623.0155 of the Texas Transportation Code." *CMA-CGM (America) Inc. v. Empire Truck Lines, Inc.*, No. 01-10-00077-CV, 2011 WL 1631961, at *1 (Tex.

---

[1] Section 623.0155, entitled "Indemnification From Motor Carrier Prohibited," provides:

  (a)    A person may not require indemnification from a motor carrier as a condition to:

    (1)    the transportation of property for compensation or hire by the carrier;

    (2)    entrance on property by the carrier for the purpose of loading, unloading, or transporting property for compensation or hire; or

    (3)    a service incidental to an activity described by Subdivision (1) or (2), including storage of property.

  (b)    Subsection (a) does not apply to:

    (1)    a claim arising from damage or loss from a wrongful or negligent act or omission of the carrier; or

    (2)    services or goods other than those described by Subsection (a).

. . . .

(d) A provision that is contrary to Subsection (a) is not enforceable.

App.—Houston [1st Dist.] April 28, 2011, no pet.) (mem. op.) (*CMA II*). On appeal from that judgment, CMA argued for the first time on appeal that "Section 623.0155 does not apply to the parties' agreement because the summary judgment establishes that Empire entered into the agreement on July 1, 1988, and Section 623.0155 applies only to contracts entered into on or after September 1, 1997." *Id.* at \*3. We remanded again, holding that Empire had not conclusively established—as necessary to support a traditional motion for summary judgment— that the date of the parties' agreement falls within the effective date of section 623.0155. *Id.* at \*4.

### C. The Underlying Judgment

On remand, the parties filed cross-motions for summary judgment. Empire's motion argued that the UIIA Agreement at issue post-dated the enactment of section 623.0155, such that the agreement's Maryland choice-of-law provision was unenforceable with respect to the indemnity requirements because it violated Texas state public policy as expressed in section 623.0155. Empire also contended that it complied with the other material terms of the UIIA Agreement.

In response, CMA argued again that the indemnity provisions in the UIIA Agreement were enforceable. CMA also argued, for the first time, that Empire breached the UIAA Agreement by failing to comply with certain insurance obligations mandated by the agreement.

7

The trial court denied CMA's summary judgment motion, and granted summary judgment again in Empire's favor. CMA timely appealed.

## ISSUES ON APPEAL

CMA brings the following issues on appeal here:

I. Whether the trial court erred by applying Texas law despite the parties' choice of Maryland law?

II. Whether the trial court erred by finding the effective date of the contract of the UIIA was November 14, 2002?

III. Whether the trial court erred in granting summary judgment as restated and overruling Appellant CMA-CGM Inc.'s No Evidence Motion for Summary Judgment in that neither the statute nor its affirmative defense, Texas Transportation Code Sec. 623.0155(a) applies to an intermodal interchange such as the provision of CMA-CGM's chassis to Empire?

IV. Whether the trial court erred in granting Empire Truck Lines' Restated Motion for Summary Judgment because Empire failed to provide insurance coverage per the insurance contract?

V. Whether the trial court erred in granting Empire Truck Lines' Restated Motion for Summary Judgment because there was a material difference between the endorsement Empire contracted to provide and what was provided in February of 2012?

VI. Whether the trial court erred in granting Empire Truck Lines' Restated Motion for Summary Judgment as there was an independent promise to provide insurance which was breached and not subject to Texas Transportation Code Sec. 623.0155?

VII. Whether there is cumulative error which denies CMA-CGM (America), Inc. due process of law and likely led to the rendition of an erroneous judgment?

Empire restates these as two issues, (1) "Whether the trial court properly ruled that the indemnity provisions of the Uniform Intermodal Interchange and

Facilities Agreement ('UIIA') were prohibited under Texas law"; and (2) "Whether the trial court properly ruled that Appellee Empire Truck Lines, Inc, named Appellant as an additional insured under its commercial auto policy and did not otherwise breach the UIIA."

## STANDARD OF REVIEW

We review a trial court's summary judgment de novo. *Valence Oper. Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When reviewing a summary judgment motion, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

## EFFECTIVE DATE OF THE UIIA INDEMNIFICATION PROVISION REQUIRING EMPIRE TO INDEMNIFY CMA FOR CMA'S NEGLIGENCE

In CMA's second issue, it argues that the trial court erred by concluding that the "effective date of the contract of the UIIA was November 14, 2002." For the

9

reasons expressed below, we conclude that the relevant question is not the effective date of the UIIA generally, but instead the effective date of the provision requiring Empire to indemnify CMA for CMA's own negligence. A review of our prior analysis on this issue demonstrates the significance of this distinction.

In *CMA II*, Empire argued that the effect of section 623.0155's prohibition on indemnity in this situation was two-fold, i.e., it (1) demonstrated, for purposes of choice-of-law analysis, that applying Maryland law to the contract would "contravene a fundamental policy" of Texas (i.e., prohibiting indemnity), and (2) invalidated the indemnity provision if Texas law was applied. 2011 WL 1631961, at *3.

CMA responded that "Section 623.0155 does not apply to the parties' agreement because the summary judgment established that Empire entered into the [UIIA] agreement on July 1, 1988, and Section 623.0155 applies only to contracts entered into on or after September 1, 1997." *Id*. at *4. Because the signature page of the agreement and various individual provisions were dated different years, we concluded that "Empire failed to establish that it entered into the contract on or after September 1, 1997 and, therefore, failed to establish that Section 623.0155 applies." *Id*. We explained the significance of the contract date, as well as the state of the record on that issue, in our opinion remanding:

> Because Section 623.0155 applies only to indemnity agreements entered into on or after September 1, 1997, Empire had to

10

prove that its indemnity agreement with CMA was entered into on or after that date in order to prevail. *See* Act of June 1, 1997, 75th Leg., R.S., ch. 1061, § 25(a), (b), 1997 Tex. Gen. Laws 4040. CMA points out that the signature page executed by Empire bears the effective date of July 1, 1988 and argues that this evidence establishes that the parties' agreement was entered into before September 1997. Empire points out that other portions of what is identified as the parties' contract contain numerous other post-September 1997 dates and this evidence establishes that the parties' agreement was entered after September 1997. We conclude that the conflicting evidence raises a question of fact.

The document bearing Empire's signature states an effective date of 1988. This document appears to be a stand-alone signature page and bears the title "Uniform Intermodal Interchange Agreement." The substantive, numbered pages of what is identified as the parties' contract bears the title "Uniform Intermodal Interchange and Facilities Access Agreement (UIIA)," identifies the effective date as November 14, 2002, and indicates that the agreement was reorganized and revised by the Intermodal Interchange Executive Committee on June 19, 2000. These pages, however, do not contain a signature by Empire. In light of this evidence, we conclude that Empire did not establish as a matter of law that the indemnity agreement between the parties was entered into on or after September 1, 1997. Because Empire bore the burden of establishing its right to judgment as a matter of law, we conclude that the trial court erred in granting Empire's motion for traditional summary judgment. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick* [*v. Harrison County Housing Finance Corp.*], 988 S.W.2d [746,] 748 [(Tex. 1999)].

*Id*. at *4–5.

Thus, the threshold question presented for us now is whether the evidence on remand established, as a matter of law, that the indemnity provision CMA relies upon was entered after the effective date of section 623.0155's prohibition on this type of indemnity obligation.

11

The UIIA is a form agreement administered across the nation by the IANA. The IANA acts as a clearinghouse, storing information related to parties to the UIIA Agreement. IANA acts as an administrator, collecting and distributing documentation (such as insurance information) to reduce the administrative burden on providers and motor carriers that would otherwise have to collect and submit voluminous information related to every transaction.

A "Preamble" page to the UIIA was signed on March 8, 1989 by Empire's terminal manager and the executive director of IANA. That signature page bore the legend "Effective 7-1-88." After Empire entered into the UIIA in 1989, IANA issued several new versions of the UIIA, each with a new effective date.

While each version of the UIIA contains some form of indemnity obligation, the record reflects that the terms of these indemnity provisions have changed over time. Significantly, earlier versions did *not* require Empire to indemnify CMA for CMA's own negligence. Rather, Empire was only required to indemnify for Empire's negligence. For example, the February 1999 provision stated provided "Motor Carrier agrees to defend, hold harmless, and fully indemnity . . . all loss, damage or liability, . . . arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange Period and/or presence on Facility Operator's premises."

On June 19, 2000, IANA issued a new UIIA that substantially changed the indemnity obligations of motor carriers such as Empire. The 2000 change included the indemnity provision at issue in this case, for the first time requiring motor carriers to indemnity equipment owners such as CMA for the equipment owner's own negligence.

Section 623 of the Texas Transportation Code went into effect on September 1, 1997. It prohibits a motor carrier in Texas from being obligated to indemnify a third-party for the third-party's own negligence as a condition to "(1) the transportation of property for compensation or hire by the carrier; (2) entrance on property by the carrier for the purpose of loading, unloading, or transporting property for compensation or hire; or (3) a service incidental to an activity described by Subdivision (1) or (2), including storage of property." TEX. TRANSP. CODE § 623.0155 (Vernon 2011).

When we remanded in *CMA II*, we held that Empire had not conclusively established that it entered into the UIIA after September 1, 1997, as required for section 623.0155 to apply. CMA argues here that, to meet this burden on remand, Empire "had to prove that both CMA's and EMPIRE's membership in IANA, and participating in the UIIA, post-dated Sept. 1, 1997, the effective date of the statute." Because the evidence demonstrated that Empire signed the UIIA in 1989

and CMA signed the UIIA in 1985, CMA asserts that Empire cannot show the indemnity agreement post-dated section 623.0155. We disagree.

On remand, Empire established, through its summary-judgment evidence, that although its signature page of the UIIA was dated 1989, the indemnity provision that CMA seeks indemnity under was not added to the UIIA until 2000. While section 623.0155 states that it "does not apply to a contract or agreement entered into before the effective date" of September 1, 1997, the earliest Empire could be deemed to have entered into the agreement *to indemnify CMA for CMA's own negligence* is 2000, when such a provision was added for the first time to the UIIA. Thus, whether the "date the agreement was entered" is considered to be 2000 (when the indemnity for third-party negligence was first included) or 2002 (the applicable version of the UIIA at the time the incident occurred[2]), it necessarily post-dated section 623.0155's effective date of September 1, 1997.

CMA focuses on the language in Preamble signed by both parties providing that the undersigned agreed "to be bound by the provisions of this Agreement and subsequent amendments or revisions thereof." And CMA cites authority that a "written agreement is not superseded or invalidated by a subsequent integration relating to the same subject matter if the agreement is such that might naturally be

---

[2] The trial court's conclusion that the effective date of the relevant UIIA was November 14, 2002 was informed in part by the merger clause in that version providing, "This Agreement supersedes all prior agreements and understanding, oral or written, if any, between the Parties except as contained herein."

made as a separate agreement [because p]arties to a contract may adjust the details of a transaction without abrogating the entire agreement." Because the UIIA from the original agreement "all the way through 2002 . . . contained indemnity language running from the motor carrier to the equipment provider," CMA contends the trial court erred by concluding that the indemnity agreement post-dated the effective date of section 623.0155. We disagree.

First, it does not follow that just because Empire agreed in 1988 to be bound by subsequent amendments to the UIIA, that a new indemnity provision added in 2000 should be considered to have an "effective date" of 1988 for purposes of applying section 623.0155. Moreover, there is a real and substantive difference between an agreement to indemnify for a party's own negligence (as existed in the UIIA before 2000) and an agreement to indemnify another party for that third-party's own negligence. Nothing CMA argues undercuts the trial court's conclusion that Empire did not enter an agreement to indemnify for CMA's negligence before 2000 for purposes of applying section 623.0155.

Because the trial court correctly concluded that the indemnity provision at issue here post-dated section 623.0155's effective date, we overrule CMA's second issue.

**THE SCOPE OF SECTION 623.0155 OF THE TEXAS TRANSPORTATION CODE**

In CMA's third issue, it argues that "neither the statute nor its affirmative defense, Texas Transportation Code Sec. 623.0155(a), applies to an intermodal interchange such as the provision of CMA-CGM's chassis to Empire." Specifically, it contends that "Empire failed to establish that § 623.0155 . . . was intended by the legislature to apply to contracts for the exchange of intermodal equipment."

**§ 623.0155 Indemnification From Motor Carrier Prohibited**

> (a)   A person may not require indemnification from a motor carrier as a condition to:
> (1)   the transportation of property for compensation or hire by the carrier;
> (2)   entrance on property by the carrier for the purpose of loading, unloading, or transporting property for compensation or hire; or
> (3)   a service incidental to an activity described by Subdivision (1) or (2), including storage of property.
> (b)   Subsection (a) does not apply to:
> (1)   a claim arising from damage or loss from a wrongful or negligent act or omission of the carrier; or
> (2)   services or goods other than those described by Subsection (a).
> . . . .
>
> (d) A provision that is contrary to Subsection (a) is not enforceable.

According to CMA, the statute cannot be applicable because "equipment interchange is not 'transportation for hire' under the statute." Thus, it contends, "if

16

at all, the intent of the statute was to apply to the transaction between Eastman Chemical [the shipper] and Appellee [Empire] under these facts and circumstances."

In response, Empire argues that subsections 623.0155(a) (1), (2), and (3) each independently apply to prohibit indemnification by Empire for CMA's negligence. Empire notes that the statute's "application is broad and is not limited to shippers, but instead prohibits any 'person' from requiring indemnity from a motor carrier as a condition in any one of three contemplated separate scenarios." Empire also points out that the statute "does not require the person seeking indemnity be the same person compensating or hiring the motor carrier," and that "it is undisputed that Empire was being compensated for the work it was performing."

There are no cases interpreting the scope of section 623.0155, so we look to the plain language of the statute. We need not determine the scope of subsections 623.0155(a) (1) or (2) today, because we conclude that subsection 623.0155(a)(3) applies. There is a tripartite relationship between the shipper (Eastman), the equipment provider (CMA), and the motor carrier (Empire). CMA is obligated under the UIIA to recognize and affirm its responsibility owed to Empire, as lessee of its equipment, to service its rental equipment such as the chassis, including inspecting, repairing, and maintaining the equipment in accordance with the

Federal Motor Carrier Safety Regulations. Subsection 623.0155 prohibits anyone from requiring indemnification from a motor carrier as a condition to "the transportation of property for compensation or hire," "entrance property . . . for the purpose of loading, unloading, or transporting property for compensation or hire," or "*a service incidental* to" one of these activities. (emphasis added).

Here, Empire was compensated for its carrier services by Eastman. Empire entered the property where the accident occurred specifically to transport CMA's chassis, which it had rented through a rental-services agreement for intermodal transportation. The UIAA provides that the "Provider [CMA] and/or Facility Operator grants to Motor Carrier [Empire] the right to enter upon its terminal facility for the sole purpose of completing an Interchange of Equipment," i.e., the chassis. CMA does not articulate how Empire's interchange of CMA's equipment is not "incidental to" Empire's "transportation of property for compensation" or "entrance on property by the carrier for the purpose of loading, unloading, or transporting property for compensation or hire." We conclude the indemnity provision found within the UIIA governing Empire's and CMA's contractual relationship falls within the purview of section 623.0155(a)(3).

We overrule CMA's third issue.

## MARYLAND VERSUS TEXAS LAW

In CMA's first issue, it argues that "the trial court erred by applying Texas law despite the parties' choice of Maryland law." It argues that the law of the case doctrine barred the trial court from revisiting conflicts of law, and alternatively, that the trial court's conflicts-of-law determination was incorrect. Empire contends that the trial court properly applied Texas law.

We first must address CMA's contention that "the court erred by failing to follow the law of the case set out in *CMA I*." Specifically, it asserts that, on the previous remands in *CMA I* and *CMA II* "there was no mandate from this Court to revisit the conflicts of laws analysis completed by this Court" in *CMA I*.

Generally, a ruling of an appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings in the same case. *Houston Endowment, Inc. v. City of Houston*, 468 S.W.2d 540, 543 (Tex. Civ. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.). "A determination of whether a prior decision in the same case will be reopened upon a second appeal is a matter within the discretion of the appellate court." *Id*.

Here, not only did we not limit the reconsideration of the conflicts-of-law issue on remand in *CMA I* and *CMA II*, we specifically contemplated that would be revisited by the trial court. In *CMA I*, we held that Maryland law applied without reference to section 623.0155 or consideration of the possibility that it rendered

19

application of Maryland law violative of Texas state public policy. 285 S.W.3d at 15–17. Empire brought section 623.0155 to our attention for the first time on motion for rehearing. *Id*. at 18 (supp op. on rehearing). We declined to address it for the first time on rehearing, but noted that the trial court was not prohibited from doing so on remand:

> Other than the instruction that the trial court must conduct proceedings that are consistent with our opinion, we have not limited the issues that may be presented upon remand to the trial court. The implications, if any, of section 623.0155 have never been addressed by us or the trial court, and, upon proper presentation, may be addressed by the trial court upon remand.

*Id*.

In *CMA II*, after the trial court held on remand that Texas law must be applied because application of Maryland law would violate Texas public policy, we remanded again because CMA had raised a fact issue with respect to the date Empire entered into the agreement to indemnify CMA for CMA's own negligence. 2011 WL 1631961, at *4–5. We recognized in that opinion that the effective date of that agreement was significant as to whether section 623.0155 was applicable, which in turn was significant to the issue of whether Texas or Maryland law applied. *Id*. at *3. Accordingly, we disagree with CMA that our conclusion in *CMA I* (without reference to section 623.0155) that Maryland law applied was law of the case that prohibited the trial court from deciding, in light of section

20

623.0155, that Texas law instead applies. We will thus consider the merits of the trial court's choice-of-law decision.

Texas law generally permits parties to resolve uncertainty as to which jurisdiction's laws will govern their performance under a multi-jurisdictional contract by including a choice-of-law provision in the agreement. *CMA I*, 285 S.W.3d at 13–14 (citing *Nexen, Inc. v. Gulf Interstate Eng'g Co.*, 224 S.W.3d 412, 419 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Chase Manhattan Bank, N.A. v. Greenbriar N. Section II*, 835 S.W.2d 720, 723 (Tex. App.—Houston [1st Dist.] 1992, no writ)). As we explained in *CMA II*, when the parties' contract includes a choice-of-law provision that selects the law of a jurisdiction bearing a substantial relationship to the parties or their transaction, the parties' contractual obligations are governed by the law chosen by the parties unless

(1)    there is a state with a more significant relationship to the transaction,

(2)    applying the chosen law would contravene a fundamental policy of that state, and

(3)    that state has a materially greater interest in the determination of the particular issue.

*See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex.1990) (citing RESTATEMENT OF (SECOND) CONFLICT OF LAWS §§ 187(1)–(2) & 188)); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 169–70 & n.11 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (same).

21

"Satisfaction of the second element of this test is not, alone, sufficient to result in rejection of the parties' contractual choice-of-law." *CMA II*, 2011 WL 1631961, at *2. "Instead, we must enforce the parties' selection of Maryland law unless all three elements of this test are satisfied." *Id*. (citing *DeSantis*, 793 S.W.2d at 678).

**A. Does Texas have a more significant relationship to the transaction?**

CMA contends that "Maryland's relationship to the transaction giving rise to the indemnity promise is at least as significant as that of Texas." It concedes that the injury took place in Texas and that the "the agreement itself provides for litigation venue in the situs where the transaction giving rise to the indemnification dispute occurs," but argues that "the State of Maryland bears a significant relationship to the relationship between Empire and CMA concerning the interchange of the intermodal equipment under the UIIA."

CMA cites analysis from the Western District of Tennessee concluding that, because the transaction at issue in that case concerned the parties' agreement to be bound by the UIAA, Maryland bore a material connection to the transaction between the parties. *See Yang Ming Marine Transp. Corp. v. Intermodal Cartage Co., Inc.*, 685 F. Supp. 2d 771, 780–81 (W.D. Tenn. 2010). In *Yang Ming*, Mitsubishi contracted Yang Ming (a Taiwan company and owner of the containers at issue) to ship six containers from Japan to Memphis, Tennessee. *Id*. at 773. The

22

containers were shipped on an ocean freighter to Long Beach, California, and then were shipped via railway to Memphis. *Id.* at 774. Intermodal then picked up one of the containers from the railyard in Memphis and delivered it to Global Material Service's facilities, also in Memphis, where one of Global's employees suffered fatal injuries while unloading the container. *Id*. at 775. Later, Intermodal picked up the empty container and returned it to the railway. *Id.*

Yang Ming, Intermodal, and the railroad were all signatories to the UIIA, which the court recognized as "an industry contract between multiple intermodal truckers, drayage companies, and water and rail carriers which facilitates these companies in the business of shipping goods by reducing the amount of paperwork involved in complicated logistical transactions." *Id*. at 775–76.

The injured employee's widow brought a wrongful death suit against several defendants, including Yang Ming, but not Intermodal. *Id*. at 777. Yang Ming was later dismissed from the wrongful death suit, but only after it incurred substantial attorneys' fees and costs defending the suit. *Id*. at 778. Pursuant to an indemnity clause in the UIIA, Yang Ming requested that Intermodal indemnify Yang Ming for defending against the plaintiff's claim that Yang Ming was negligent. *Id.* Yang Ming argued that Maryland law applied under the choice-of-law provision in the UIIA, and Intermodal contended that Tennessee law instead applied. *Id*. at 779.

The court began by noting that, in "resolving contractual disputes in the absence of an enforceable choice-of-law provision, Tennessee . . . applies the law of the state where the contract was made, absent a contrary intent." *Id*. A contractual choice-of-law provision is respected in Tennessee so long as (1) it is executed in good faith," (2) "the jurisdiction whose law is to govern must bear a material connection to the parties' business," (3) "the parties' choice of law must be reasonable and not merely a sham or subterfuge," and (4) the law of the jurisdiction of the parties' choosing must not be contrary to a fundamental policy of a state which possesses a materially greater interest and whose law would otherwise govern. *Id*. at 780.

The parties in *Yang Ming* agreed that the UIIA choice-of-law provision was executed in good faith and was not merely a sham or subterfuge." Intermodal, however, argued that (1) "the state of Maryland bears no material connection to the transaction at hand because neither of the parties had any place of business there and no part of the parties' business occurred within its borders," and (2) "the enforcement of the UIIA's choice-of-law provision would violate Tennessee public policy by recognizing a duty to defend or indemnify a party for its own negligence where such duty was not clearly and unequivocally embodied within the agreement." *Id*. The district court rejected both arguments. It noted that the Tennessee courts had consistently held that a provision requiring a party be

indemnified against its own negligence is not against public policy, *id*. at 782, and

it explained its view that Maryland had a "material connection to the transaction":

> The transaction with which the court is presently concerned is the parties' agreement to be bound by the terms of the UIIA, which governs the rights and obligations flowing between Intermodal and Yang Ming, and not the transport or actual movement of the container from Nagoya, Japan to Memphis, Tennessee. The UIIA is administered by the Intermodal Interchange Executive Committee ("IIEC"), a subdivision of the IANA, which has its principal place of business in Maryland. As part of its administrative duties, the IIEC collects information from the motor carriers who are signatories of the UIIA at its Maryland office and then disseminates that information to equipment provider signatories in an effort to lessen the amount of paperwork necessary for those companies to do business with one another. Essentially, the IIEC, through its administration of the UIIA, provides a clearing house for motor carriers and equipment providers who agree to be bound by the terms of the UIIA. The IIEC provides this service from its location in Maryland and it was through this service that Intermodal was able to do business with Yang Ming. In addition, it is undisputed that Yang Ming's and Intermodal's agreement to participate in the UIIA was accepted by an authorized officer at the IANA headquarter in Maryland at which time the agreement became effective. Thus, the agreement was executed in Maryland. Maryland, therefore, bears a material connection to the transaction between the parties.
>
> The court finds little merit in Intermodal's argument concerning this prong of the analysis. The underlying complaint alleged negligence in not only the transportation and inspection of the container, but also in the loading of the container. The loading of the container took place solely in Japan. The container itself traveled across the Pacific Ocean and multiple states before reaching Memphis, Tennessee, where the Miller accident ultimately occurred. Therefore, it would be difficult to find that Tennessee bore a closer relation to the "transaction" than any number of other forums even if the court were to look to Intermodal's interpretation and consider the movement of the container as the actual transaction at issue.

*Id*. at 780–81.

CMA urges us to employ the same analysis, arguing that the IANA has always been based in Maryland, and that because Empire's and CMA's signatures were accepted by the IANA there, that location at least as, if not more, significant than Texas. CMA also contends that weighing relevant Restatements concerns support recognition of an indemnity obligation here "because of the importance of intermodal transportation to interstate commerce, and the protection of the driving public (including the Texas public) by maintaining fully insured intermodal equipment on United States highways."

Empire argues that *Yang Ming* is distinguishable in that the alleged negligence occurred in several states, unlike this case in which all the activities took place in Texas. Empire also points to analysis by a Central District Court in California rejecting the view that Maryland had a significant relationship to a particular transaction governed by the UIIA just because the IANA is based there. *See Elite Logistics Corp. v. MOL Am., Inc*, No. CV 11-02952 DDP, 2012 WL 2366397, at *3 (C.D. Cal. June 21, 2012). *Elite* involved a dispute between Mol, a company that transports cargo containers over sea and land, and Elite Logistics, a trucking company hired by Mol to handle overland portions of some of Mol's shipments. *Id*. at *1. The parties are both signatories to the UIIA. *Id*. After Elite sued Mol, complaining that Mol's calculation of late pick-up and drop-off fees on

weekends and holidays violates a provision of California's Business and Professions Code, Mol moved to compel arbitration under the UIIA. *Id.* Before addressing Elite's defenses to the UIIA's arbitration provision, the court concluded that California law applied, despite the UIIA's Maryland choice-of-law provision:

> Before determining whether the Provision is valid, this court must first determine, under the choice-of-law rules of the forum state, which state's laws apply. *Pokorny v. Quixtar*, 601 F.3d 987, 994 (9th Cir. 2010). Here, the Agreement contains a Maryland choice of law provision. In California, courts generally respect choice-of-law provisions within contracts that have been negotiated at arm's length. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 464 (1992). Choice-of-law provisions will not be enforced, however, if "the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties choice" or 2) the chosen state's law is contrary to the fundamental public policy of a state that has a materially greater interest in the issue at hand and whose law would otherwise apply. *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002–03 (9th Cir. 2010); *Nedlloyd*, 3 Cal.4th at 465.

> Here, Maryland has no relationship to the parties or the transactions at issue here. No party is located in Maryland, nor does it appear that any party conducts substantial business in Maryland. Elite asserts, and Mol does not dispute, that all of the transactions relevant here occurred in California. Elite's claims arise under California state law alone. This case's only tie to Maryland is the fact that the Association, which drafted the Agreement, is located in Maryland. The Association, however, is not a party to this case. The court cannot find any reasonable basis to apply Maryland law where the only conceivable connection to Maryland is a contract of adhesion drafted by a third party. Accordingly, California law applies.

27

*Id.* at \*3.[3]

Empire urges us to employ a similar reasoning to conclude that Texas has the most significant relationship to the transaction, given that (1) "the work that gave rise to Mr. Aguirre's alleged accident was being performed *exclusively* in Texas," (2) "[t]he subject matter of the contract—the transportation of chemicals from Longview, Texas to the Port of Houston—was solely in Texas," (3) "Empire is a business incorporated and doing business in Texas," (4) "Mr. Aguirre was dispatched by Empire in Texas to perform his trucking services solely in Texas," (5) "[t]he CMA chassis that broke was located in Texas," (6) "Mr. Aguirre's injury occurred in Texas, and (7) "the ensuing litigation involving Mr. Aguirre, CMA, and Empire was filed in Texas."

The supreme court has directed us to consider the question of whether "there is a state with a more significant relationship to the transaction" than the one contractually specified by the parties with reference to the factors outlined in Restatement (Second) of Conflict of Laws § 188:

(1) the place of contracting,

(2) the place of negotiation of the contract,

---

[3] In a footnote, the court also explained it found significant that "the Agreement was not negotiated at arm's length. The Association drafted the standard language of the Agreement, to which Elite had to agree in order to conduct business with Mol. '[C]ourts should not apply choice-of-law provisions in adhesion contracts if to do so would result in substantial injustice to the adherent.'" *Elite*, 2012 WL 2366397, at \*3 (citing *Flores v. American Seafoods Co.*, 335 F.3d 904, 918 (9th Cir. 2003)).

(3) the place of performance,

(4) the location of the subject matter of the contract, and

(5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*E.g.*, *DeSantis*, 793 S.W.2d at 677–78; *see also Chesapeake Oper., Inc.*, 94 S.W.3d at 170. These factors, in turn, are to be taken into account "in light of the basic conflict of laws principles of section 6 of the Restatement." *DeSantis*, 793 S.W.2d at 678 & n.2

For guidance, we have a Fourteenth Court of Appeals' en banc opinion applying *DeSantis*'s framework to decide what law applied to an indemnity dispute involving a standard daywork drilling contract supplied by an industry trade association. *See Chesapeake Oper. Inc.*, 94 S.W.3d at 170. In that case, an Oklahoma company (Chesapeake) hired a Texas company (Nabors Industries) to drill an oil well in Louisiana. *Id.* at 166. Each party negotiated and signed the agreement in their home state. *Id.* The contract contained an indemnity agreement protecting each party from suit by the other party's employees or contractors, regardless of fault, and provided that Texas law would apply. *Id.* Two Texas resident Chesapeake subcontractors were injured at the job site and sued Chesapeake, Nabors, and others; one brought suit in Harris County, Texas and the other in Brazoria County, Texas. *Id.* at 167. Nabors sought indemnity from Chesapeake under the indemnity agreement. *Id.*

29

Six justices joined a majority opinion in *Chesapeake* placing emphasis on the place of suit and domicile of the parties in determining the state with the most "significant relationship to the transaction," 94 S.W.3d 166–80 (Brister, J., joined by Anderson, Fowler, Seymore, Guzman, and McCloud, J.J.) with four justices dissenting with the view that the state in which the drilling work and injury took place was more important to the choice-of-law analysis, *id.* at 180–87 (Wittig, J., dissenting, joined by Yates, Hudson and Frost, J.J.); *id.* at 188–200 (Frost, J., dissenting, joined by Hudson and Wittig, J.J.), and one other justice opining in a dissent that the Restatement analysis has overcomplicated the issue and that we should allow states to enact laws impacting activities within their borders without uncertainty about whether another state's law can trump. *Id.* at 200–01 (Edelman, J., dissenting).

The oilfield indemnity clause in *Chesapeake* met the requirements to be enforceable in Texas, but was void and unenforceable in Louisiana because it "operate[s] in favor of a negligent party." *Id.* at 169 (citing LA. REV. STAT. ANN. § 9:2780(B)). Starting with the Section 188 factors, the court of appeals concluded that, as between Louisiana and Texas, Texas would be considered the place of contracting (factor 1), negotiation (factor 2), and place of domicile and place of

30

business (factor 5).[4]  *Id*. at 170–71.  The court then noted that the place of performance (factor 3) and location of the subject matter of the contract (factor 4) were "more difficult to pin down."  *Id*. at 171.  These factors particularly matter, because the supreme court has held "the place of performance was of 'paramount importance' in service contract cases."  *Id*. (citing *Maxus Exploration Co. v. Moran Bros.*, 817 S.W.2d 50, 53 (Tex. 1991)).

The court recognized that there were "two possible meanings of the 'place of performance': (1) where the drilling services were performed [i.e., Louisiana], and (2) where the indemnity obligation was performed (by defending against the injured employee's suit) [i.e., Texas]."  *Id*.  Paying heed to the supreme court's admonishment in *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) that the court must "consider which state's law has the most significant relationship *to the particular substantive issue to be resolved*," the *Chesapeake* court concluded that the place of indemnity was most relevant to determining what state had a more significant relationship.  *Id*. at 172.  Thus, the court ultimately concluded that the place of performance (factor 3) and location of the subject matter (factor 4) also favored Texas.  *Id*.

---

[4]  The court acknowledged that one of the parties, Chesapeake, was actually domiciled in Oklahoma, but concluded that this was irrelevant to the analysis because Oklahoma indemnity law is the same as Texas's, and because contacts with Oklahoma did not negate the fact that Texas had a greater connection than Louisiana.

Next, the *Chesapeake* court "evaluated these contacts according to their relative importance with respect to the particular issue in the cases" before it, *id*. at 173 (citing Restatement § 188(2)), stressing the need to "evaluate these contacts not by their number, but by their quality," *id*. (citing *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996)). The court looked to the purpose of both the Louisiana and Texas oilfield indemnity statutes as "prevent[ing] large oilfield companies from imposing contracts of adhesion on smaller oilfield contractors." *Id*. Citing a string of state and federal courts "applying the law of the parties' domiciles when considering conflicting indemnity laws," the court observed that generally "the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power." *Id*. citing Restatement § 188 cmt. c.; *see also Roberts v. Energy Dev. Corp*, 235 F.3d 935, 943 (5th Cir. 2000) (disregarding Texas choice-of-law provision in oilfield contract, where injury occurred in Louisiana, the lawsuit was filed in Louisiana, and the defendant was domiciled in Louisiana). The *Chesapeake* court ultimately concluded that, while domicile is not "the sole test," it is entitled to "special weight." *Id*. at 175.

Finally, the *Chesapeake* court applied "to these weighted contacts the principles listed in Restatement section 6," as directed by Restatement 2nd § 188(2).

Choice-of-Law Principles

(1)    A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2)    When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a)    the needs of the interstate and international systems,

(b)    the relevant policies of the forum,

(c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)    the protection of justified expectations,

(e)    the basic policies underlying the particular field of law,

(f)    certainty, predictability and uniformity of result, and

(g)    ease in the determination and application of the law to be applied.

*Id.*; *see also DeSantis*, 793 S.W.2d at 678 & n.2.

Putting "aside the parties' explicit choice of Texas law, but certainly not the rest of their contract" the *Chesapeake* court concluded that "the relative policies and interests of Texas and Louisiana (the second and third principles) tip toward Texas, as the state with the strongest interest in fair bargaining by resident businesses," especially because Texas has a "strong commitment to the principle of

33

contractual freedom." *Id*. at 176. The court also concluded held that applying Texas law furthered the "justified expectations of the parties and the policies underlying contract law (the fourth and fifth principles)." *Id*. at 176. Finally, the court held that "[c]ertainty, predictability, and uniformity and the needs of the interstate and international systems (the first and sixth principles) also support application of Texas law" and that "ease of determination and application of law (the seventh principle) points to applying the law of the state where the injured party brought suit." *Id*. at 177.

The dissenting opinions in *Chesapeake* took issue with the majority's conclusion that the site of the lawsuit (and, thus, the site of the indemnity) and the domicile of the parties is of paramount importance. *See id.* at 180–81 (Wittig, J., dissenting) ("We believe Louisiana law, not the law of a forum selected by the litigants, should regulate indemnity obligations arising from accidents occurring wholly within Louisiana and arising solely out of the operation of Louisiana wells."); *Id.* at 198 (Frost, J, dissenting) (disagreeing with majority's analysis is Restatement factors and opining that controlling law and policy mandate application of Louisiana law to injuries arising from work at Louisiana oil well); *see also id*. at 200 (Edleman, J., dissenting) ("[T]o the extent that the legislative body and courts of a state have promulgated the laws to be followed in that state, how can the courts of another state presume to decide, as the Restatement method

34

contemplates, that some of those laws are important enough to be enforced with regard to activities in that state, but others are not?").

The *Yang Ming* case cited by CMA finds the UIIA's connection to Maryland paramount because the trade association that drafted it is headquartered there. The *Elite* case cited by Empire finds the opposite, holding the fact that the association that drafted the UIIA is located in Maryland offers Maryland law no connection to the parties or the transaction. We conclude that neither of these cases' approach is consistent with Texas law's application of the Restatement.

Applying the analysis from *DeSantis* and *Chesapeake*, we hold that the trial court correctly concluded that Texas has a "more significant relationship with the parties and their transaction than" Maryland. According to *DeSantis*, we start with the Restatement 188 factors:

    (1) the place of contracting,

    (2) the place of negotiation of the contract,

    (3) the place of performance,

    (4) the location of the subject matter of the contract, and

    (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*E.g.*, *DeSantis*, 793 S.W.2d at 677–78.

When a contract contemplates personal services, the place of performance (factor 3) is given the most weight. *E.g.*, *DeSantis*, 793 S.W.3d at 679. Like

*DeSantis*, but unlike *Chesapeake*, there is no question about what qualifies as the place of performance in this case because both the injury occurred and the lawsuit was filed (i.e., the situs of the indemnity) in Texas. Another consideration that *DeSantis* and *Chesapeake* teach us is afforded considerable weight is the domicile of the parties (factor 5), which also points to Texas, as defendant Empire is incorporated in Texas and the injured party, Aguirre, is a Texas resident. In addition, the location of the subject matter of the contract (factor 4) is Texas, as Empire was hired to move CMA's chassis from one Texas location to another Texas location. It is possible that the other two factors—place of contracting (factor 1) and place of negotiation (factor 2)—favor Maryland. The record is silent about whether any negotiation took place,[5] and we know that Empire's and CMA's signatures on UIIA were accepted by the IANA in Maryland. The section 188 contacts weigh heavily in favor of Texas.

Next, we "evaluate[] these contacts according to their relative importance with respect to the particular issue" in our case, i.e., indemnity. *Chesapeake*, 94 S.W.3d at 173 (citing RESTATEMENT 2D § 188(2)). Similar to the strong state policy *Chesapeake* recognized in oilfield indemnity statutes in "prevent[ing] large

---

[5] It is doubtful that much negotiation took place, given that the UIIA is a form agreement and there was summary-judgment evidence that the UIIA predominates, as "virtually all of the interchange domestically in North America is done pursuant to the UIIA." *See also Elite*, 2012 WL 2366397, at *3 (characterizing UIIA as a contract of "adhesion").

36

oilfield companies from imposing contracts of adhesion on smaller oilfield contractors," we presume that section 623.0155 of the Texas Transportation Code reflects Texas's interest in preventing Motor Carriers from having indemnity obligations in adhesion contracts imposed upon them in a uniform shipping scheme that is difficult to operate outside of.

Finally, we look to the choice of law principles articulated in section 6 of the Restatement:

> (a)     the needs of the interstate and international systems,
>
> (b)     the relevant policies of the forum,
>
> (c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d)     the protection of justified expectations,
>
> (e)     the basic policies underlying the particular field of law,
>
> (f)     certainty, predictability and uniformity of result, and
>
> (g)     ease in the determination and application of the law to be applied.

*Id.* at 175; *see also DeSantis*, 793 S.W.2d at 678 & n.2.

The parties present extensive arguments about why these section 6 principles weigh in favor of applying Maryland or Texas law.  CMA argues that the uniform application of Maryland law across all states furthers the majority of these factors, given "the importance of intermodal transportation to interstate commerce, . . . [and] the protection of the driving public (including the Texas public) by

37

maintaining fully insured intermodal equipment on United States highways." According to CMA, a "patchwork, state-by-state approach would undermine the basic goal of the UIIA agreement, which is to promote intermodal transportation and fully insured equipment for purposes of compliance with federal law." CMA also argues that because Empire has an obligation to insure the chassis during the interchange period, it naturally follows that it has the obligation to indemnity CMA for any claim related to the interchange period, even related to CMA's own negligence. According to CMA, "Texas has an interest in promoting the fungibility of this equipment, and for it to be truly commercially fungible, the insurance coverage on the equipment must be fungible as well." CMA thus insists that applying section 623.0155 "would frustrate the intent to insure by undermining the indemnity obligation (that is co-extensive under the UIIA with the insurance obligation). Finally, CMA argues that Maryland law was chosen "in order to accomplish a federal goal: compliance with insurance requirements" of the Federal Motor Carrier Safety Act.

Empire, on the other hand, contends that "[a]llowing CMA to seek indemnity from Empire for CMA's own negligence in maintaining and servicing its equipment would only serve to allow CMA to shift its obligations to comply with federal law, and under the UIIA, to Empire." Empire argues that allowing "such an arrangement would only decrease workplace safety," because CMA

"would have no incentive to maintain its equipment because it could simply shift the burden to Empire for any personal injury or other harm caused by CMA's equipment." Empire cites the legislative history of section 623.0155's pre-codification predecessor, Tex. Rev. Civ. Stat. art 6701d-11 § 3C, as indicating its passage was in response "to federal deregulation of motor carriers and to continue pre-existing regulatory protections for motor carriers against unduly broad indemnity provisions."[6]

Empire also disputes that whether Texas prohibits motor carriers from being required to indemnify others for their negligence has any bearing on interstate law or commerce. It stresses that it is not the validity of the UIIA in its entirety at issue here, but whether the indemnity provision is valid in Texas. Empire contends that none of CMA's arguments "demonstrate how requiring a motor carrier to indemnify an equipment provider for its own negligence somehow furthers interstate law, promotes, safety, or achieves any laudable goal." Empire disagrees that the federal regulations cited by Empire governing insurance requirements has anything to do with indemnity.

We agree with Empire that most of CMA's policy arguments conflate issues related to insurance and issues related to indemnity. These policy arguments thus

---

[6] The purpose was to "specifically limit[] a motor carrier's indemnification to wrongful or negligent acts on the part of the motor carrier." Tex. H.B. 2517 Comm. Report 74th Leg., R.S. (1995).

39

lose force when we separate the two and focus on the issue covered by section 623.0155—indemnity.[7]

The strongest policy arguments in support of application of Maryland law is the "ease in the determination and application of the law to be applied," "certainty, predictability and uniformity of result," and "protection of justified expectations." RESTATEMENT (SECOND) OF CONFLICTS OF LAW §6. We are not convinced, however, that these policies outweigh the specific anti-indemnity considerations that underlie the legislature's enactment of section 623.0155. Given the specifics of the industry, there is certainly a need for uniformity among states in many aspects of shipping and intermodal exchange. With the UIIA, the IANA goes far in promoting efficiency in that respect, providing rules governing interchanges and the parties' respective obligations, as well as serving as a document clearinghouse for daily transactions between shipping companies, motor carriers, equipment providers, and terminal facilities.

---

[7]     For example, CMA spends considerable time arguing that use of the UIIA is "representative of an industry effort to comply with the insurance regulations with fungible intermodal equipment" and that there "can be no valid suggestion that the insurance regulations, as to minimum financial responsibility for 'vehicles' as defined, adopted by the Secretary, do not serve an important public function to ensure that fully insured commercial vehicles populate our highways." But section 623.0155 of the Texas Transportation Code does not prohibit parties from complying with insurance regulations; nor does it prevent each party from complying with federal insurance regulations or contractual insurance obligations. It only prohibits contracts that require motor carriers to indemnity for third parties' negligence in certain circumstances.

It does not, however, eviscerate these general benefits of the UIIA to honor the important public policy that Texas and other states may recognize in protecting their resident motor carriers from being required to indemnify for third-party's negligence. Maryland has a statute similar to section 623.0155 that specifically exempts the UIIA. Texas's legislature could have built in the same exception, but did not. That reflects a policy decision that is not outweighed by the benefits of uniformity in the rules governing indemnity state-to-state.

For all of these reasons, we hold that Texas has a "more significant relationship with the parties and their transaction than" Maryland. *DeSantis*, 793 S.W.2d at 678.

## B. Would application of Maryland law contravene a fundamental policy of Texas?

The next consideration in the choice-of-law analysis is whether application of the chosen law would contravene the law of the state with more signification interest in the transaction. *DeSantis*, 793 S.W.2d at 678. We have already held, in resolving CMA's second issue, that section 623.0155(a) of the Texas Transportation Code applies to CMA's claim for indemnity, and that applying Maryland's law to permit enforcement of the UIIA's indemnity provision would contravene the anti-indemnity policy expressed in section 623.0155(a). Accordingly, we hold that application of Maryland law would contravene a fundamental policy of Texas.

41

## C. Does Texas have a materially greater interest in the determination of the particular issue?

Finally, we must look at whether Texas "has a materially greater interest in the determination of the particular issue." *DeSantis*, 793 S.W.2d at 678. For many of the reasons already discussed, we conclude that it does. In *DeSantis*, the supreme court weighed whether Texas had a materially greater interest than Florida (the law identified by the parties' contract) in determining whether a noncompete agreement between a Texas resident and a Florida-based company was enforceable. *Id.* at 679. "At stake [in *DeSantis* was] whether a Texas resident can leave one Texas job to start a competing Texas job." *Id.* While acknowledging that Florida had an interest in protecting a national business headquartered in Florida, and that Texas and Florida had a shared interest "in protecting the justifiable expectations of entities doing business in several states," the supreme court concluded that "the circumstances of this case leave little doubt, if any, that Texas has a materially greater interest than Florida in deciding whether the noncompetition agreement in this case should be enforced." *Id.* In other words, the supreme court placed great weight on the state's interests with regard to Texas residents and business conducted here.

In *Chesapeake,* both the majority and the dissenting opinions recognized a state's significant interest in both its residents and business contained within its borders. Regardless of which view is adopted here, both support the view that

Texas has a strong interest in (1) protecting the interests of Texas corporations doing business in Texas, (2) regulating the shipping industry operations in Texas, (3) protecting its own state public policy being applied to Texas residents in Texas lawsuits arising out of injuries in Texas.

Given that Maryland's only interest is that it houses the industry trade group that promulgated the UIIA—a group that is not a party to this lawsuit—we hold that Texas has a materially greater interest than Maryland.

The trial court correctly held that Texas law applied to the indemnity provision at issue here. We accordingly overrule CMA's first issue.

### THE INSURANCE POLICY

CMA's fourth, fifth, and sixth issues argue that the trial court should not have granted summary judgment because, it alleges, Empire did not adequately comply with its insurance obligations under the UIIA.

The relevant portions of the UIIA provide:

6. Insurance: To the extent permitted by law, Motor Carrier shall provide the following insurance coverages in fulfillment of its legal liability and obligations contained in this Agreement:

a. A commercial automobile liability policy with a combined single limit of $1,000,000 or greater, insuring all Equipment involved in Interchange including vehicles of its agents or contractors; said insurance policy shall name the Equipment Provider as additional insured.

b. A commercial general liability policy with a combined single limit of $1,000,000 per occurrence or greater;

43

c.   Motor Carrier shall have in effect, and attached to its commercial automobile liability policy, a Truckers Uniform Intermodal Interchange Endorsement (UIIE-1), which includes the coverages specified in Section F.4 Motor Carrier shall use endorsement form UIIE-1 (or other corresponding forms which do not differ from UIIE-1) in the most current form available to the insurance carrier. Evidence of the endorsement of the policy and the coverage required by the provision shall be provided to IANA by the insurance company.

d.   IANA shall receive a minimum of thirty (30) days advance Notice of any cancellation of such coverages.

7.   The Provider agrees that it will obtain all information concerning Motor Carrier Certificates of Insurance from the Intermodal Association of North America, and that additional evidence of insurance will not be requested form Motor Carrier Participants.

## A.   Failure to Timely Produce Proof of Insurance Policies

CMA frames its fourth issue as "the trial court erred in granting Empire Truck Lines' Restated Motion for Summary Judgment because Empire failed to provide insurance coverage per the insurance contract." The heading for the corresponding argument is slightly different, complaining instead about the timing and method of Empire's providing evidence of insurance: "The trial court erred in granting Empire's restated motion for summary judgment because Empire was the first party in breach—CMA-CGM was entitled to rely on Empire's discovery responses and judicial admissions which are part of the summary judgment evidence."

CMA does not argue that Empire failed to procure the required insurance under the UIIA. Rather, it argues that Empire anticipatorily breached the UIIA by failing to produce copies of its 2002–2003 automobile liability policy naming CMA as an additional insured until 2012. Empire responds CMA never sought coverage under the policy as an insured, but only sought indemnity and defense from Empire through the indemnity clause in the UIIA. Empire also insists that CMA was obligated to seek proof of insurance from IANA, not Empire, by the express terms of the UIIA. CMA disputes this, arguing that its obligation to obtain information about insurance coverage from the IANA may "not have remained operative after litigation ensued."

CMA's arguments at times treat the insurance and indemnity obligations as separate, and other times as the same. It begins by arguing that Empire's "promises to indemnify, and the promise to provide insurance are independent, both under the subject agreement." But it then contends that Empire's "silence" in the face of a demand for indemnity equates to a breach of "the insurance promise." CMA also complains of Empire's position throughout litigation that only coverage under the commercial general liability policy and not under the automobile liability policy were relevant in this case, accusing Empire of changing positions by producing the automobile liability policy in 2012.

45

Empire pointed out in the trial court that CMA had made two separate claims: first, it argued that Empire failed to provide defense and indemnity in violation of Section F.4 of the UIIA; second, and later, it argue that Empire failed to name CMA as an additional insured on Empire's commercial automobile policy under Section F.6 of the UIIA. According to Empire, (1) the automobile policy has never been relevant to its duty to indemnify, (2) the evidence demonstrated CMA has been aware of the policy since 2007 (as CMA attached proof of the coverage to filings in the trial court in 2007), and (3) Empire had no duty to produce the policy. Empire noted that CMA never made any written discovery request for the automobile policy, and that Rule 192.3(f) of the Texas Rules of Civil Procedure only requires a party to produce an indemnity or insurance agreement which may satisfy all or part of a judgment rendered. In compliance with Rule 192.3(f), Empire produced early on its comprehensive general liability policy, which it believes is the policy that would satisfy any judgment in this case.

CMA characterizes Empire's failure to timely produce the automobile policy as an anticipatory breach that precludes summary judgment. Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance. *Van Polen v. Wisch*, 23 S.W.3d 510, 516 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). It is conduct that shows a fixed intention to abandon,

renounce, and refuse to perform the contract. *In re Braddock*, 64 S.W.3d 581, 585 (Tex. App.—Texarkana 2001, no pet.).

It is clear from CMA's petition that, although it references both Empire's indemnity and insurance obligations, the gist of its complaint—and the only harm alleged—is the failure of Empire or its insurance company to indemnify and defend CMA against claims by Aguirre. Empire's summary judgment motion likewise states it sought summary judgment on "the claims against it for indemnity brought by CMA."

There is evidence that, as contemplated by the UIIA, there was information about Empire's commercial automobile liability policy—and CMA's coverage as an additional insured party—available to CMA from the IANA. We agree with Empire that, as an additional insured, CMA could have sought coverage by filing a claim under that policy if it believed it was entitled to coverage under that policy. Given this, CMA has not articulated how Empire's failure to independently provide to CMA information about the policy at any particular time defeats Empire's otherwise entitlement to summary judgment holding that it is not required, under Texas law, to indemnify CMA for its own negligence. CMA's only articulation of potential harm from delay refers to indemnity, not additional direct insurance:

> Courts recognize that silence in the face of a demand for indemnity is properly construed as a denial of the request for indemnity. *YK Line*

*v. PB Industries, Inc.*, 2004 WL 1629613 (S.D. Ind. Apr. 20, 2004) (construing UIIA).

> To construe the silence otherwise would place litigants in an untenable position of the late acceptance of a demand for indemnity well after presentment has been made, and in the context of a contract for insurance, subject to defenses of prejudicial late notice to an insurer. That is precisely what may occur here, left uncorrected.

This argument speaks to prejudice from the late assumption of an obligation to indemnify, which Empire has not assumed, and which it will not assume in the future. That is a different issue than prejudice from failure to disclosure direct insurance that could leave an insured party subject to defenses from the insurance company resisting direct coverage. It appears from the record that Empire has sought coverage related to this incident under its general liability, but not its commercial automobile policy. Assuming that Empire's automobile liability policy is relevant in this situation (which we need not decide), nothing in the record indicates that CMA has filed a claim as an insured under Empire's automobile policy that it has undisputedly known about for at least six years, much less that it has suffered any difficulty filing a direct claim. Because CMA has not demonstrated that its complaints about the timing of production of Empire's commercial automobile policy rendered erroneous the trial court's summary judgment that the UIIA's provision requiring Empire to indemnify CMA for its own negligence is against public policy, we overrule CMA's fourth issue.

## B.	Variance in Coverage

In its fifth issue, CMA argues "the trial court erred in granting Empire Truck Lines' Restated Motion for Summary because there was a material difference between the endorsement Empire contracted to provide and what was provided in February of 2012." Specifically, CMA contends that "there was a material difference between the endorsement required by the UIIA in effect at the time of the accident and that which was belatedly produced."

The UIIA required Empire's policy "have in effect, and attached to its commercial automobile liability policy, a Truckers Uniform Intermodal Interchange Endorsement (UIIE-1) . . . . Motor Carrier shall use endorsement form UIIE-1 (or other corresponding forms which do not differ from UIIE-1) in the most current form available to the insurance carrier." In actuality, Empire's policy was endorsed with a 1992 UIIE-1 form promulgated by the ITA, an IANA predecessor rather than the most current form available in 2003 at the time of the accident.

In response, Empire argues that (1) CMA's claims were not based on differences in insurance terms, (2) the outdated form contained language specifically incorporating subsequent amendments, and (3) the "language contained in the UIIE-1 attached to Empire's commercial automobile policy contained the same equivalent material terms as the subsequent UIIE-1."

49

CMA's pleadings do not mention a variance in the forms of the UIIE-1 endorsements. The first reference we find to this argument is in its response to Empire's motion for summary judgment on indemnity. In response, Empire argued that the required terms were incorporated in the 1992 UIIE-1, and that, in any event, the terms of the 1992 and 2003 forms were materially the same. Because Empire did not object or otherwise argue in its summary judgment reply that CMA had not pleaded a claim for breach of the UIIA premised on a variance in the forms, we will consider the merits of CMA's issue here. *Cf. ViaNet v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) ("When Safety Lights asserted the discovery rule for the first time in its summary judgment response, Via Net had two choices: it could object that the discovery rule had not been pleaded, or it could respond on the merits and try the issue by consent. By choosing the latter course, the discovery rule's applicability was placed squarely before the trial and appellate courts.").

We need not decide, however, if the language in the 1992 UIIE-1 and the 2003 UIIE-1 are equivalent (or whether a variation would somehow negate summary judgment on the issue of indemnity) because we agree with Empire's argument that the express terms of the UIIE-1 endorsement to Empire's automobile liability policy incorporated subsequent amendments:

> It is agreed that **such insurance as is afforded by the policy** for Auto Bodily injury and Property Damage Liability applies to liability

assumed by the Named Insured as "subscribing carrier" under Paragraph 9.1 of the [UIIA], . . . and ***under any subsequent amendments thereto*** . . . .

(emphasis added).[8]

CMA does *not* dispute that this language purports to incorporate into Empire's 2002–2003 automobile policy not only the provisions of the 1992 UIIE-1 endorsement form attached to the 2002–2003 policy, but also provisions in any updated version of that form so as to comply with the requirement that the policy include "endorsement form UIIE-1 (or other corresponding forms which do not differ from UIIE-1) *in the most current form available to the insurance carrier*." (emphasis added).  Instead, CMA points to Empire's argument that the effective date of the indemnity provision requiring it indemnify CMA for its own negligence was 2002—the applicable version on the date of Aguirre's accident—and contends that "Empire cannot have it both ways."  In other words, it argues that there is a fatal inconsistency in the argument that Empire's agreement, for purposes of section 623.0155's effective date, was 2002, and then argument that an earlier endorsement form incorporates the later, because "without the legal effect of the continued and uninterrupted participation by Empire in the UIIA through IANA,

---

[8] Empire produced summary-judgment evidence, in the form of deposition testimony by the chief drafter of the UIIA, that the UIIE-1 contained this language incorporating subsequent amendments because the trucking industry often missed out on revisions to the various UIIA-related forms, and thus outdated forms were inadvertently attached to policies.

the amendments to the insurance coverage certified would not have changed over time." We disagree.

CMA cites no authority in support of its argument, and we do not see an inconsistency in (1) applying the date of the current version of the UIIA indemnity provision as the "agreement date" for applying section 623.0155's effective date, and (2) giving legal effect to the language in the 2002–2003 insurance policy 1992 UIIE-1 endorsement form incorporating any later amendments to that form.

We overrule CMA's fifth issue.

**INSURANCE BREACH VERSUS RIGHT TO INDEMNITY**

In CMA's sixth issue, it argues that "the trial court erred in granting Empire Truck Lines' Restated Motion for Summary Judgment as there was an independent promise to provide insurance which was breached and not subject to Texas Transportation Code Sec. 623.0155." CMA provides no argument or authority in support of this issue in the body of its brief.

The brief "must contain a succinct, clear, and accurate statement of the argument made in the body of the brief." TEX. R. APP. P. 38.1(h). *See Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.— Houston [1st Dist.] 2002, pet. denied) ("Rule 38 requires [appellant] to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue.").

CMA does not have a live claim against Empire for breach of the UIIA with regards to its providing automobile liability insurance, and nowhere in its briefing of other issues does it articulate how a breach of its "independent promise to provide insurance" (by providing untimely copies or the wrong endorsement) legally precludes the trial court's summary judgment that (1) Texas law applies to Empire's indemnity obligation and (2) that indemnity obligation is unenforceable in Texas. Accordingly, CMA's sixth issue is waived.[9]

## CUMULATIVE ERROR

In CMA's seventh issue, it argues that "there is cumulative error which denies CMA-CGM (America), Inc. due process of law and likely led to the rendition of an erroneous judgment." CMA restates and lists the alleged errors complained of in its other issue statements and asks us to consider them cumulatively. Because we have not found error in response to CMA's other issues, we do not find cumulative error.

We overrule CMA's sixth issue.

---

[9] Although we overruled on the merits CMA's arguments related to Empire's delay in providing its automobile policy and its contention that the EIIE-1 endorsement was not the required version, CMA's failure to establish how a breach of Empire's insurance obligation in these regards could create a fact issue precluding the trial court's summary judgment that enforcement of the indemnity provision was against Texas public policy provides an additional, independent reason for overruling CMA's fourth and fifth issues.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.